Richard W. Ward
6860 N. Dallas Pkwy., Ste. 200
Plano, TX 75024
Telephone: 214-220-2402
Proposed Attorney for the Debtor
    In Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN RE:

    Universal Nutrients, LLC          Case no. 16-43070-MXM-11
        Debtor in Possession         (Chapter 11)

**EMERGENCY MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTOR TO
OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 364(c) AND
364(d), (II) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363(c); (III) GRANTING ADEQUATE PROTECTION
PURSUANT TO 11 U.S.C. § 361; AND (IV) SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001(c)**

TO: THE HONORABLE MARK X. MULLIN, UNITED STATES BANKRUPTCY
    JUDGE:

        COMES NOW the debtor-in-possession, Universal Nutrients, LLC (the "Debtor") who

hereby moves (the "Motion") this Court for entry of interim and final orders pursuant to sections

361, 362 and 364 of title 11 of the United States Code (11 U.S.C. §§ 101 et seq., as amended, the

"Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") (i) authorizing the Debtor to obtain post-petition financing; (ii)

authorizing the Debtor to use cash collateral on the terms and conditions set forth herein; (iii)

granting adequate protection; scheduling and approving the method of notice of the final hearing

on the Motion (the "Final Hearing"); and (iv) providing related relief. In further support of this

Motion, the Debtor respectfully represents:

**JURISDICTION AND PROCEDURAL BACKGROUND**

1.      This Court as jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief requested herein are sections 361, 362 and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 6004.

4.      On August 5, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing this case (the "Case").

5.      Since the Petition Date, the Debtor has continued to operate and manage its business as debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

6.      As of the date of this Motion, no official committee of unsecured creditors has been appointed.

## STATEMENT OF FACTS

### A.      Business Overview

7.      The Debtor is a Texas limited liability company engaged in the business under the tradename of Uni*Well of manufacturing and developing various nutraceutical products, OTC pharmaceuticals, and specialty biochemicals with expertise in development and fulfillment of productivity products, functional shots, sports nutrition, nutrient deficiency products, elderly nutrition, children's nutrition, gender-specific nutrition, energy products, anti-stress products, anti-aging products, internal beauty products, and condition-specific products in the form of liquids, powders, gels, tablets, and capsules.  The Debtor has its principal office at 14801 Sovereign Dr.,  Fort Worth, Texas 76155 and is a wholly owned subsidiary of Universal Group Holdings, LLC, a Texas limited liability company ("UGH").

**B.     Secured Financing Loan Structure**

8.     The Debtor, as borrower, is liable to Exeter International, LLC ("Exeter") under that Loan Agreement between Exeter and Universal Group Holdings, LLC ("UGH") dated April 3, 2015 (the "Credit Agreement") for loan advances in amounts up to $15,000,000.  The Debtor was a guarantor of the debts under the Credit Agreement and the recipient of most, if not all funds advanced under the Credit Facility.  The Debtor secured its liability to Exeter under the Credit Agreement by granting Exeter a first lien on all assets of the Debtor.  Exeter perfected its lien on the Debtor's assets by filing a UCC1 Financing Statement.  The outstanding balance of the loan is approximately $13,000,000.  The Credit Agreement is a revolving loan, but the draw provisions under the Credit Agreement were not intended to function with weekly draws against the credit.

9.     The Credit Agreement provides the Debtor an asset-based revolving credit facility (the "Credit Facility") secured by a lien on all of the assets of the Debtor.

10.     For the Credit Facility to properly function as a DIP Loan, the terms for draws under the Credit Facility need to amended to be consistent with weekly draw requests and advances.  The Credit Facility will be amended according to DIP Term Sheet attached hereto to provide for advances up to $1,960,000 according the Budget prepared by the Debtor.

11.     **Nothing in this Motion or within the relief requested is intended to affect the loans, security interests, lien positions or rights of EXETER or other third party lender/loan/financing parties that existed on the date of filing of this Bankruptcy Case**.

**C.     Events Leading to Bankruptcy**

12.     The Debtor initially raised approximately $9,000,000 in equity and an additional $13,000,000 in funds from Exeter.   The projected product creation and sales budgets were

understated in amounts required to achieve the objections and overstated in the amount of sales that would be generated and the timing of the sale.  Ultimately sales below the initial forecast amounts and acquisitions of inventory and equipment coupled with other business expenses depleted the liquid assets of the Debtor and the resulting cash flow was inadequate for the Debtor to pay its loans and operating expenses.  Exeter declared a default and the Debtor was unable to find unsecured credit, obtain additional loans, or raise equity capital.

## RELIEF REQUESTED

### A.      The Debtor's Immediate Need for Post-Petition Financing and Use Cash Collateral

13.      The Debtor seeks authority to maintain and continue the current Credit Facility with EXETER, and the authority to use its cash collateral within the confines and workings of the Credit Facility.  Without the use of Cash Collateral and the funds to be obtained under the Credit Facility, the Debtor lacks sufficient liquidity to meet ongoing obligations and will be unable to continue operations throughout this Case.  Any interruption in the Debtor's business operations would be devastating and would likely result in its inability to continue as a going concern and a consequent loss of significant value with respect to estate assets.  As part of the consideration for agreeing to the use of cash collateral and continued availability under the Credit Facility as a post-petition facility, the Debtor has consented that all Obligations under the Credit Agreement will become rolled up into a post- petition facility described below, which will convert the pre-petition outstanding balances on the notes issued under the Credit Agreement to become post-petition loans.  The other terms that might be of most interest to creditors and parties in interest are set forth below.

14.      The Debtor requires immediate access to the Credit Facility as amended by the DIP Term Sheet and use of its cash collateral to assure continuity of its business operations.

Further, the Debtor submits that the requested post-petition loans and use of cash collateral should be approved by the Court as the most advantageous and least adversarial method of proceeding.

**B.      The Debtor's Seek Authority to Obtain Post-Petition Financing**

15.      The Debtor has determined in the exercise of its sound business judgment that it needs and should amend the Credit Facility as stated in the DIP Term Sheet (referred to herein as the "<u>Post-Petition Credit Facility</u>").  Given the indisputable need for post-petition financing and the need to seek immediate relief under the Bankruptcy Code in order to protect the going concern value of the Debtor's business and assets, the Debtor, as noted, approached EXETER to discuss continuing the Credit Facility as post-petition financing.  Following good faith negotiations, the Debtor has reached an agreement with EXETER regarding maintenance of the Credit Facility on agreed terms (as set forth herein) and extending it to be effective as a post-petition facility in accordance with and subject to the agreements set forth herein and that certain the DIP Term Sheet and within the amended credit agreement to be executed on an interim basis if the Court approves the interim relief requested herein, which will become final and executory upon final approval if granted by the Court.  Additionally, the Debtor has agreed to negotiate an amended credit agreement reflecting the terms of the DIP Term Sheet and providing a legally enforceable contract ("<u>Amended Credit Agreement</u>").

16.      The Debtor believes that the Post-Petition Credit Facility represents the best source of post-petition financing available to it at this time.  As discussed herein, the Debtor considered and pursued alternative debtor-in-possession financing.  While these discussions presented certain alternatives as regards financing, the Debtor believes that the Post Petition Credit Facility is the best opportunity to preserve the going concern value of the business,

recognizing the secured position of EXETER and the willingness of EXETER to allow the Debtor to maintain the Line of Credit. Without access to the Post-Petition Credit Facility, the Debtor would be unable to continue business operations in its present capacity which could jeopardize its going concern value.

17.     As mentioned, and of importance to parties in interest and the Court, the consideration of the financing to be provided includes a full "roll up" of the pre-petition debt owed to EXETER into post-petition debt under the Amended Credit Agreement, upon final approval of the financing and use of cash collateral. The effect of the full "roll up" is that all pre-petition debt to EXETER will be converted to post-petition debt under the Amended Credit Agreement, as though all amounts due as of the petition date had been lent post-petition. The Debtor points out this feature, as the effect will be to convert some $13 million in pre-petition debt to a like amount of post-petition debt as part of the consideration of granting a post-petition revolving operating loan with availability of approximately $1,960,000.00.

18.     Further, collateral for the Amended Credit Agreement ("Post-Petition Collateral") will include all bankruptcy-related causes of action and any recovery thereon, including but not limited to all causes of action under Chapter 5 of the Bankruptcy Code, including, but not limited to, Section 506(c), Sections 544 through 550, and Section 553 or other applicable law, all to secure what as of final approval will be a post-petition loan of the entirety of amounts due under the Credit Agreement and any additional amounts lent post-petition under the Amended Credit Agreement.

19.     The Debtor represents that EXETER is and will be adequately protected with respect to the Credit Facility by the Pre-Petition Collateral and the Post-Petition collateral and by the agreements herein and within this Motion whereby EXETER will maintain all Pre-Petition

Lender Liens and the Debtor shall grant EXETER replacement liens and maintenance of and lien rights on post-petition generated property that would otherwise be defined as Pre-Petition Collateral under the Credit Facility. Therefore, as an initial matter, adequate protection provided herein will, along with the proposed Post-Petition Credit Facility, provide EXETER with adequate protection of its Pre-Petition Lender Lien upon the Pre-Petition Collateral. Accordingly, the Debtor has met the requirements of Bankruptcy Code § 364(d). Without the financing requested herein, it is likely that the assets of the Debtor would have to be liquidated either outside of bankruptcy through foreclosure or through a chapter 7 case. Either alternative, the Debtor believes, would cause a precipitous decline in the value of the assets and operations.

20. Further, EXETER shall be granted a first priority lien and security interest in, to and upon any accounts, work-in-progress, inventory or other collateral as described within and/or granted under the Credit Facility that might be generated post-petition and also shall obtain liens in, to and upon all bankruptcy-related causes of action and any recovery thereon, including but not limited to all causes of action under Chapter 5 of the United States Bankruptcy Code, including, but not limited to, Section 506(c), Sections 544 through 550, and Section 553 or other applicable law, and as well any and all commercial tort actions not specifically made part of the Pre-Petition collateral, with all such post-petition property to be deemed "Post-Petition Collateral" subject to the Post-Petition Lien under and securing the Amended Credit Agreement and al loans thereunder, including without limitation the Post-Petition Revolving Facility. Any extensions of credit under the Post-Petition Credit Facility (and any of the Obligations under the Amended Credit Agreement) shall be secured by both the Pre-Petition Collateral and the Post-Petition Collateral, without the necessity of any further collateral or security filings by EXETER, with all filings creating the Pre- Petition Liens to constitute perfection of the Post-Petition Liens

in, to and upon the Pre and Post- Petition Collateral.

21.     EXETER has agreed that any party in interest with standing to commence a contested matter or adversary proceeding to object to or challenge the validity of the Credit Agreement and the Pre-Petition Liens by the forty-fifth (45th) days following entry of the Final Order (the "Challenge Period").  Absent any timely objection, the lien finding shall automatically be final at the end of the Challenge Period.

22.     EXETER has also demanded and shall be granted a super-priority administrative claim under Section 364(c)(1) of the Bankruptcy Code to the extent provided by Section 507(b) of the Bankruptcy Code.

23.     The Debtor and EXETER agree that the term of the Line of Credit under the Post- Petition Credit Facility, and also the maturity of the Amended Credit Agreement shall be the earliest to occur of the following dates: (a) the closing date of the sale of all or substantially all of the assets of the Debtor pursuant to Section 363(b), (d) and (f) of the Bankruptcy  Code (the  "363 Sale") or (b) the  effective  date  of  a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations under the Amended Credit Agreement or otherwise acceptable to EXETER.  Additionally, the Amended Credit Agreement (including the Credit Facility and the Post-Petition Credit Facility) termination events shall include (i) the appointment of a trustee in these Cases, (ii) the dismissal or conversion of these Cases, (iii) the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of the Debtor with a value in excess of $100,000, and (iv) the making of any Debtor proposal to the Bankruptcy Court for the sale of all or substantially all of any of its respective assets not approved by EXETER.

**C.     The Debtor's Seek Authority to Use Cash Collateral**

24.     The Debtor seeks (a) authorization to use its cash collateral in accordance with the terms and conditions set forth herein and in accordance with the proposed budget (the "Budget") a copy of which is attached hereto as **EXHIBIT A**, which is also the budget   that governs and projects availability under the Post-Petition Credit Facility; (b) authority to use Cash Collateral on a final basis in accordance with the proposed Budget and Final Order; and (c) granting of adequate protection to EXETER as regards the Pre-Petition Collateral pursuant to Bankruptcy Code §§ 361 and 363(c), as described herein, to the extent that EXETER held the Pre- Petition Lender Liens on the Pre-Petition Collateral, including without limitation cash collateral or the proceeds of collateral that would be cash collateral.

25.     As noted, the Debtor has an immediate need to use cash collateral, including cash proceeds, to continue the operation of its business and to preserve the value of the business as a going concern.  Without such funds, the Debtor will not be able to pay costs and expenses, including, but not limited to, wages, salaries, rent, professional fees, and general and administrative operating expenses that arise in the administration of these Case and in the ordinary course of the Debtor's business.

26.     The Debtor must be able to use cash collateral to continue its business operations on an uninterrupted basis. The Debtor requests interim authorization to use cash collateral in accordance with the terms and conditions set forth herein and in accordance with the proposed Budget until a final order granting further use of cash collateral can be entered.  The Debtor is without sufficient funds to operate for fourteen or more days until a final hearing on this Motion can be held.  The Debtor's inability to timely pay the costs and expenses set forth herein will result in immediate and irreparable harm to the Debtor. Because the Debtor's request for interim authorization seeks the use of only that amount of cash collateral as is necessary to avoid

immediate and irreparable harm to the value of its assets pending a final hearing, its request complies with Bankruptcy Rules 4001(b)(2) and 6003.

27.     The Budget itemizes the sources and uses of cash and provides a projection of cash receipts and expenditures.  The Budget includes business expenses that are reasonable and necessary and that must be paid in order to continue the Debtor's business until such time as a final hearing on the Motion can be held.  The Budget shall not vary by more than fifteen percent (15%) for each week during any Budget period or more than ten percent (10%) on a cumulative basis for that portion of the Budget period then ended unless Exeter consents, in writing, to the variance.  The Debtor proposes that any amounts listed in the Budget that are unused in any month may be carried over and used by the Debtor in any subsequent month.

28.     Therefore, the Debtor seeks entry of an order pursuant to Bankruptcy Code Sections 361 and 363 and Bankruptcy Rule 4001(b) (a) authorizing the Debtor to use cash collateral to pay overhead, operating expenses, and ordinary course obligations necessary to maintain and preserve the going-concern value of the Debtor's assets and business, and to administer the estates, including, but not limited to, using cash collateral to pay (i) any prepetition operating and other expenses approved by the Court, (ii) the post-petition operations of the Debtor's business, and (iii) all costs and expenses arising in connection with the administration of these estates, and (b) granting adequate protection to EXETER.

## AUTHORITY

### A.  The Post-Petition Credit Facility Should be Authorized

29.     Approval of the Post-Petition Credit Facility and Amended Credit Agreement terms will provide the Debtor with immediate and ongoing access to borrowing availability to pay its current and ongoing operating expenses, including post-petition salaries and utility and

vendor costs. Unless these expenditures are made, the Debtor will be forced to cease operations, which could result in irreparable harm to its business and substantial going concern value being destroyed. The credit provided under the Post-Petition Credit Facility will enable the Debtor to continue to pay salaries and operate its business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest. This availability of credit hopefully can provide the Debtor's vendors and suppliers the confidence that will enable and encourage them to restore its credit and/or other relationship with the Debtor, or will provide the Debtor with liquidity to afford cash terms to certain extent. Accordingly, the timely approval of the relief requested herein is imperative.

30.      Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. Section 364(d)(1) of the Bankruptcy Code provides that the Court may authorize a debtor to incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if (a) the debtor is unable to obtain such credit otherwise, and (b) there is adequate protection of the interest of the holder of the lien on which such senior or equal lien is to be granted. Section 364(d) is not applicable, as EXETER is the senior lender. The Debtor proposes to obtain the financing set forth in the Post-Petition Credit Facility by providing, *inter alia,* superpriority claims, security interests, and liens pursuant to sections 364(c)(l), (2) and (3) of the Bankruptcy Code (the financing under the senior debt facility will

not create a priming situation where one did not previously exist; therefore the Debtor is not attempting to obtain financing secured by a senior or equal lien on property that is subject to a lien as set forth in Section 364(d)).

31.     The Debtor's liquidity needs can be satisfied only if they are authorized to borrow funds under the Post-Petition Credit Facility and to use such proceeds to fund operations. The Debtor has been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1).  The Debtor has also been unable to obtain post-petition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein that did not require a priming fight with EXETER.

32.     Having determined that financing is available only under sections 364(c) of the Bankruptcy Code, the Debtor negotiated with the EXETER at arm's length.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g., See, e.g, Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789* F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Curlew Valley Assocs., 14* B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.,* 47 B.R.

444, 449 (D. Colo. 1985).

33.     First, the Debtor has been unable to procure the required funding absent the proposed claims and liens.  The Debtor submits that the circumstances of these cases require the Debtor to obtain financing under sections 364(c) and to the extent applicable 364(d) of the Bankruptcy Code, and accordingly, the Post-Petition Credit Facility reflects the exercise of sound business judgment.

34.     Second, the Debtor needs the funds to be provided under the Post-Petition Credit Facility to preserve the value of its estates for the benefit of all creditors and other parties in interest.  Specifically, the Debtor needs the funds to be provided under the Post- Petition Credit Facility to maintain operations and signal to its suppliers and other vendors that they are credit-worthy and that its vendors can and should continue to provide its products to the Debtor on substantially the same credit terms as during the pre-petition period.  Alternatively, the Debtor needs financing to pay ongoing expenses and to procure necessary inventory for servicing customers.  Absent the Post-Petition Credit Facility and use of the Cash Collateral, the Debtor will be unable to operate its business or prosecute these chapter 11 cases, and the Debtor's vendors may refuse to provide the goods (and credit) the Debtor's business require.

35.     The terms and conditions of the Post-Petition Credit Facility were negotiated by well-represented parties in good faith and at arm's length, and were the best that the Debtor could negotiate, given the fact that the defaults under the Credit Facility EXETER precluded additional financing through the Credit Facility.  Accordingly, all obligations incurred under the Post-Petition Credit Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.

36.     The proposed Interim Order provides that the automatic stay provisions of

section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit

the Exeter to exercise, upon the occurrence and during the continuation of any Event of Default,

all rights and remedies provided for in the DIP Facility Agreement, and to take various actions

without further order of or application to the Court.  However, Exeter must provide the Debtor

and any official committee, with five (5) business days written notice to seek an injunction prior

to exercising any enforcement rights or remedies in respect of the collateral or upon a shorter

period of time after notice and a hearing.   Therefore the Debtor and official committees reserve

the right to seek injunctive relief to maintain non-consensual use of cash collateral post-

termination event (not to force continued lending).

37.    Stay modification provisions of this sort are ordinary and usual features of DIP

financing facilities and, in the Debtor's business judgment, is reasonable under the present

circumstances.  Accordingly, the Court should modify the automatic stay to the extent

contemplated by the Amended Credit Agreement, the Post-Petition Revolving Facility

Agreement and the proposed Orders.

### B.    The Use of Cash Collateral Should be Authorized

38.    Pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor in possession

may not use cash collateral without the consent of the secured party or approval from the Court.

EXETER has consented to the Debtor's use of EXETER's cash collateral in conformity

with  this Motion.  Further, section 363(e) provides that "on request of an entity that has an

interest in property…proposed to be used, sold or leased, by the trustee, the court, with or

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide

adequate protection of such interest." 11 U.S.C. § 363(e).  The Debtor has satisfied the

requirements of sections 363(c)(2) and (e), and should be authorized to use the cash collateral.

39.    For the use of the cash collateral, the Debtor is granting EXETER replacement

Pre-Petition Lender Liens (to the extent of any diminution) on Post-Petition Collateral, with such Post-Petition Collateral as well to be Collateral for post-petition advances under the Line of Credit, in accordance with the Post-Petition Credit Facility.  The Debtor believes that such replacement liens will adequately protect EXETER for the use of Pre and Post-Petition cash collateral.

40.    The Debtor will also provide EXETER with required weekly reporting of financial information relating to projected revenues and expenses, actual revenue and expenses, and variances from the Budget, as applicable, as well as reasonable access to, among other things, the Debtor's management, books, and records, including the reporting required under the Post- Petition Credit Facility. *See, e.g., Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station Assocs., L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe the request of MBL for 'timely filing of proper monthly operating reports…' falls within the ambit of adequate protection…"); *Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 706 (Bankr. W.D. Mich. 1992) (reports required as part of adequate protection).

41.    The Debtor submits that the replacement liens and the provision of timely collateral adequately protected the interests of Exeter, and the requirements for adequate protection under Bankruptcy Code §§ 361 and 363 have been satisfied.

42.    As the full "roll up" is not to occur unless approved at the final hearing upon this motion, the Debtor does not seek as interim relief the approval of the full "roll up" of the pre-petition debt into the Amended Credit Agreement.  However, failure of this condition would result in a termination of the right of the Debtor to (i) use cash collateral under the agreement reached with EXETER and (ii) to borrow further under the Amended Credit Agreement.

**C.  The Debtor Requires Immediate Access to Cash Collateral and the DIP Facility.**

43.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Bankruptcy Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  The Debtor requests that the Bankruptcy Court conduct an expedited preliminary hearing on the Motion (the "Preliminary Hearing") and authorize the Debtor to use the Cash Collateral for the 3-week period detailed within the Interim Budget and in accordance with the terms of the Interim Order and the Interim Budget (with allowance of a 10% variance as to each line item contained within the Interim Budget).

44.    The Budget itemizes the sources and uses of cash and provides a weekly projection of cash receipts and expenditures, and provides a list of reasonable and necessary business expenses that must be paid in order to continue the Debtor's business until a final hearing on the Motion can be held.  The terms and conditions of the Budget and the proposed Interim Order are fair and reasonable, and reflect the exercise of the Debtor's prudent business judgment consistent with the fiduciary duties of a debtor-in-possession.

45.    The Debtor has an immediate need to use the Cash Collateral, including cash proceeds, to continue to operate its business.  Without those funds, the Debtor will not be able to make cash expenditures for necessary costs incurred during its reorganization, including but limited to, wages, salaries, rent, professional fees and other expenses that arise in the administration of the bankruptcy cases and in the ordinary course of the Debtor's business.  The Debtor has little to no unencumbered cash with which to operate its business – accordingly, if the

Debtor is unable to use the Cash Collateral, the Debtor will be forced to immediately cease business operations, which will negatively impact the value of its assets, cause irreparable harm to the estate, and eliminate the prospect of unsecured creditors receiving a distribution on account of its claims.

46.     The Cash Collateral that the Debtor proposes to spend in the Interim Budget will be in an amount necessary to prevent the Debtor from suffering "immediate and irreparable harm" and therefore meets the requirements for interim relief under Bankruptcy Rule 4001(b)(2) and 6003.

### D.  The Debtor will Provide Adequate Protection of EXETER's Interest in Cash Collateral.

47.     Section 363(e) provides that "on request of an entity that has an interest in property used, sold, or leased…by the trustee, the court, without or without hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  The provision governing adequate protection is not subject to a debtor's discretion, and is geared to ensure that a secured party's economic position is not worsened because of the filing of a bankruptcy case.  *See In re Las Vegas Monorail Co.*, 429 B.R. 317 (Bankr. D. Nev. 2012) ("use of the cash it generates in its operations is itself a form of adequate protection. This is because [debtor's] continued investment in, and operation of, the [collateral] will increase, or at least maintain, the collateral's value."); *In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006); *In re Ralar Distribs., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994) ("[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection").

48.     Although the Bankruptcy Code does not provide an all-encompassing definition of what constitutes adequate protection, section 361 provides a non-exhaustive list of factors that

may constitute adequate protection. A determination of adequate protection is decided on a case-by-case basis, and involves a consideration of the "nature of the creditor's interest in the property, [and] the potential harm to the creditor as a result of the property's decline in value of the method of protection." *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986).

49.     Exactly what constitutes adequate protection must be decided on a case-by-case basis. *In re Energy Partners, Ltd.*, 409 B.R. 211, 236 (Bankr. S.D. Tex. 2009) (citing *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987). Adequate protection preserves the status quo for secured creditors. *In re Good*, 428 B.R. 235, 241 -242 (Bankr. E.D. Tex. 2010). Adequate protection exists by virtue of augmentation (or preservation) of the value of a secured creditor's collateral. *See*, *In re Ralar Distribs., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994) ("[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection"); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716-17 (Bankr. D. Del. 1996) (court found secured creditor was adequately protected given lack of evidence that collateral was diminishing, debtor had operated profitably and was projected to continue operating profitably).

50.     First, the Debtor proposes to adequately protect the interest of all secured creditors, including the Exeter, in several different ways. The Debtor will maintain DIP bank accounts and deposit all post-petition Cash Collateral into such accounts to be utilized only for the normal and necessary costs of business and administration of the bankruptcy estate pursuant to the Interim Order.

51.     Second, the Debtor will maintain adequate assurance coverage and operational production in relation to the prepetition collateral and timely pay all post-petition taxes assessed in relation to the prepetition collateral in the ordinary course of the Debtor's business, thereby keeping the properties free of additional liens.

52.     Third, the Debtor proposes to grant EXETER replacement liens upon: (i) all assets in which EXETER holds a validly perfected lien as of the Petition Date; (ii) all property acquired after the Petition Date that is of the exact nature, kind or character of the Pre-petition Collateral; and (iii) all cash and receivables that are the proceeds, products, offspring, or profits of the Pre-petition Collateral.  The Debtor further proposes to grant EXETER first priority liens and security interests in avoidance actions under chapter 5 of the Bankruptcy Code.  The Debtor anticipates that the aforementioned first priority liens and security interests will adequately protect the EXETER from any diminution in the value of its interest in its collateral resulting from the use of the Cash Collateral.  *In re First Douth Sav., Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) (granting a creditor replacement liens to the extent of diminution in the value of its security interest constitutes adequate protection under section 361).

53.     Furthermore, the Debtor will provide Exeter with accurate and detailed information relating to projected revenues and expenses, actual revenues and expenses, and variances from the Budget – all of which will enable Exeter to monitor the use of the pre-petition collateral and Post-Petition Cash Collateral.  Provision of financial reports can constitute a valid form of adequate protection.  *Mutual Benefit Life Ins. Co. v. Stanley Station Assoc's, L.P. (In re Stanley Station Assoc's, L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe that the request…'for timely filing of proper operating reports…' falls within the ambit of adequate protection…").

54.     The Debtor submits that Exeter's interests are adequately protected, and the requirements for adequate protection under Bankruptcy Code §§ 363 and 364(d)(1) have been satisfied.

## **INTERIM RELIEF REQUESTED**

55.     The Debtor believes that the relief sought in this Motion is critical to achieving a smooth transition towards operation as chapter 11 debtor, and will help preserve the Debtor's going-concern value.  The interim relief requested herein, including use of Cash Collateral, and including, on an interim basis, use of the Post-Petition Revolving Facility during the interim period and prior to entry of a Final Order, is necessary to avoid immediate and irreparable harm. Accordingly, the Debtor requests immediate entry of an Interim Order to be submitted in open court, pursuant to Bankruptcy Code §§ 363 and 364 and Bankruptcy Rule 4001(b)(2) and (c)(2).

## NOTICE

56.     Notice of this Motion has been given to all parties on the Special Notice List, including, without limitation: (i) the Office of the United States Trustee; (ii) the Debtor and its counsel; (iii) EXETER International, LLC; (iv) the twenty (20) largest unsecured creditors of the Debtor; and (v) governmental agencies having a regulatory or statutory interest in these cases. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

## CONCLUSION

The Debtor respectfully requests that this Bankruptcy Court enter an order: (i) authorizing the Debtor to obtain post-petition financing as detailed herein pursuant to 11  U.S.C. §§364(c) and to the extent applicable 364(d); (ii) authorizing the Debtor to use the Cash Collateral pursuant to 11 U.S.C. § 363(c) on an interim basis in accordance with the terms and conditions set forth within this Motion, the Budget, and the Interim Order; (iii) granting adequate protection pursuant to 11 U.S.C. § 361 as contemplated by this Motion; (iv) scheduling a final hearing on the Motion on a date that is not earlier than 15 days following the filing of this Motion; and (iv) granting such other and further relief as is just and proper.

Respectfully submitted,


/s/ Richard W. Ward
Richard W. Ward
Texas Bar no. 20846350
6860 N. Dallas Pkwy., Ste. 200
Plano, TX 75024
Telephone: 214-220-2402
Facsimile: 972-499-7240
Email: rwward@airmail.net
Proposed Attorney for the Debtor in Possession